**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| KELLY GODWIN, an Individual, | No. 83463-1-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| STATE FARM FIRE & CASUALTY COMPANY, an Illinois Corporation doing business in Washington, | |
| Respondent. | |

ANDRUS, C.J. — Kelly Godwin filed a claim with State Farm under her homeowner's insurance policy after her roof was damaged by a windstorm. State Farm agreed to cover repairs to the portion of the roof damaged by the storm. Godwin sued State Farm for breach of contract, arguing that her policy required the insurer to pay to replace the entire roof. The trial court granted summary judgment for State Farm and Godwin appealed. Because the policy at issue is unambiguous and does not obligate State Farm to pay to replace the undamaged portion of Godwin's roof, we affirm.

<u>FACTS</u>

In August 2015, Kelly Godwin purchased a Tudor-style house built in 1934 in Port Orchard, Washington. She insured the house with a homeowner's policy

Citations and pin cites are based on the Westlaw online version of the cited material.

No. 83463-1-I/2

issued by State Farm.  In December 2018, a windstorm blew some shingles off of Godwin's roof.  She reported the damage to State Farm in March 2019.

Godwin hired Keith Delgado of Patriot Roofing to perform the repairs. Delgado testified that he inspected the roof and determined that it had sustained wind damage on the ridge and front half of the house, but not on the back slope. Delgado prepared a report in which he opined that "[t]he existing [shingles] on the house are at their end of life and need[] to be replaced."  He prepared a proposal for a full roof replacement, including replacing all of the old asphalt composite shingles with comparable "Certainteed Landmark" asphalt shingles; installing a new underlayment and ice and water shield in the valleys, roof penetrations, and chimney; installing a new baffled ridge vent system to generate airflow from the attic; removing old roof vents no longer needed; removing roof sheeting in places to install baffles to ensure the attic insulation was not blocking airflow in the attic; installing double insulated hoses in the bath fan exhausts and flapper vents, new chimney flashing and counter-flashing; new safety roof anchors and all new steel drip edges on the eaves to facilitate water runoff; and replacing old neoprene boots around plumbing vents with new metal ones.  Delgado's cost estimate for this work was $20,628.08.  Godwin accepted Delgado's proposal and his company replaced her roof consistent with it.

On March 21, 2019, Godwin filed a claim with State Farm and Delgado sent his report and cost proposal to the insurer to support her claim.  According to State Farm, it agreed to pay to replace "all of the shingles on the [roof] slope that had

No. 83463-1-I/3

been damaged." It refused to pay to replace the entire roof because the back slope had not lost any shingles.[1]

Godwin filed this suit for insurance bad faith, breach of contract, and a violation of the Consumer Protection Act.[2] State Farm moved for summary judgment, arguing that Godwin's homeowners' policy was unambiguous and required it to cover only repairs to the damaged portion of her roof. In response, Godwin submitted a declaration from Delgado who testified that the shingles on Godwin's roof "were at the end of their useful life and could not be matched for color or condition due to age and fading."[3] Delgado confirmed that no permit was required for his replacement work because Kitsap County does not require a permit when less than 2,100 square feet of roofing materials are being replaced on a single family residence.

The trial court granted State Farm's motion for summary judgment. Godwin appeals.

ANALYSIS

Godwin argues the trial court erred in granting summary judgment for State Farm because the policy provision requiring the insurer to repair or replace the "damaged part of the property," extends to the entire roof. Godwin separately

---

[1] We do not have any evidence in the record to indicate what portion of the cost estimate State Farm paid, but it appears undisputed that State Farm reimbursed Godwin for a portion of Delgado's work attributable to replacing shingles along the roof ridge and front slope of the roof.

[2] RCW ch. 19.86.

[3] Delgado also testified that replacing the entire roof was "necessary due to wind damage," and that all roofing material manufacturers recommend that roof ventilation comply with the International Residential Code, the building code adopted in Washington. He further opined that the failure to properly ventilate and balance ventilation can reduce or eliminate warranties for a roof replacement. State Farm moved to strike these paragraphs of Delgado's declaration as inconsistent with his deposition testimony, conclusory, or inadmissible legal opinion. The court granted this motion to strike. Godwin does not challenge that decision on appeal.

- 3 -

argues that the policy language requiring State Farm make repairs with "similar construction" obligated it to match new shingles with the old, and if no shingles exist to provide a uniform appearance, the insurer had to replace the entire roof. Finally, Godwin contends there are genuine issue of material fact as to whether the policy required State Farm to pay to replace the entire roof to comply with building code requirements under a separate provision of the policy.

We conclude the State Farm policy is unambiguous and only required State Farm to pay to repair the portion of the roof that sustained wind damage and did not require it to replace Godwin's entire roof.

Appellate courts review a summary judgment order de novo and perform the same inquiry as the trial court. Kut Suen Lui v. Essex Ins. Co., 185 Wn.2d 703, 709-10, 375 P.3d 596 (2016). Interpretation of an insurance contract is also a question of law we review de novo. Id. at 710. When we interpret an insurance policy, we consider it as a whole, giving it a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance. Id. Where a term is undefined, we assigned it its ordinary meaning. Vision One, LLC v. Philadelphia Indem. Ins. Co., 174 Wn.2d 501, 512, 276 P.3d 300 (2012). Ambiguities and exclusions are construed against the insurer. Id. We harmonize clauses that seem to conflict in order to give effect to all of the contract's provisions. Kut Suen Lui, 185 Wn.2d at 710.

<u>"The damaged part of the property"</u>

The parties agree that Godwin's policy covered "accidental direct physical loss," including wind damage, and excluded losses caused by "wear, tear, marring,

scratching, deterioration, inherent vice, latent defect, or mechanical breakdown."

Godwin contends that State Farm was required to replace her entire roof, including

those portions of the roof not damaged in the wind storm, under Coverage A1,

entitled "Replacement Cost Loss Settlement." The provision at issue provided:

> a. We will pay the cost to repair or replace with similar construction
> and for the same use on the premises shown in the Declarations, the
> damaged part of the property . . ., subject to the following:
>
>> (1) until actual repair or replacement is completed, we will pay
>> only the actual cash value at the time of the loss of the
>> damaged part of the property, . . . not to exceed the cost to
>> repair or replace the damaged part of the property;
>>
>> (2) when the repair or replacement is actually completed, we
>> will pay the covered additional amount you actually and
>> necessarily spend to repair or replace the damaged part of the
>> property, or an amount up to the applicable limit of liability
>> shown in the Declarations, whichever is less.

(Emphasis added).

Godwin contends that the phrase "the damaged part of the property" in this

section of the policy means the entire roof of her home because it was her roof

that sustained wind damage. We reject this interpretation as not a fair, reasonable,

or sensible construction of the policy. Nothing in the policy requires the insurer to

treat the roof as an indivisible part of the covered property. Where only a portion

of the roof is damaged, a reasonable consumer of an insurance policy would

interpret the policy to provide coverage only for the damaged portion. The

undamaged slope of the roof is unambiguously not "the damaged part of the

property."

Godwin relies on Erie Insurance Exchange v. Sams, 20 N.E. 3d 182 (Ind.

Ct. App. 2014) to support her argument that "the damaged part of the property"

- 5 -

No. 83463-1-I/6

should be interpreted as entitling her to a new roof. But the evidence in <u>Sams</u> is much different from the evidence here. In that case, after sustaining roof damage in a wind storm, the Sams family filed a claim with their insurer. <u>Id.</u> at 185. The policy there stated that "[p]ayment will not exceed . . . the replacement cost of that part of the dwelling damaged." <u>Id.</u> at 186. The parties disputed, among other issues, whether the policy required Erie to pay for the replacement of the shingles on the damaged portion of the roof only, or whether it needed to replace the entire roof. <u>Id.</u> After trial, the court found that the wind storm caused the entire roof to leak, and that it was "an unsound roof after the loss, with leaks [in] many places on the roof." <u>Id.</u> at 188.

On appeal, Erie argued that "part of the dwelling damaged" meant only the individual roof slopes sustaining direct physical damage during the storm and not the whole roof. <u>Id.</u> at 191. But the court disagreed. It concluded

> The trial court based its judgment on the evidence the parties introduced, and the court's judgment is well within the evidence presented. Therefore, under these specific facts, and based on the evidence presented in this case, the court's judgment that the replacement cost of the Samses' damaged roof . . . was not clearly erroneous.

<u>Id.</u> at 192. The outcome of the case was, therefore, highly fact-specific.

Unlike <u>Erie</u>, Godwin presented no evidence that the wind storm damage rendered her entire roof unsound. Godwin provided evidence that the damage to her roof extended no further than missing shingles on the front slope of her roof and along the roof ridge. There is no evidence that the loss of these shingles rendered the entire roof unsound or created pathways for leaks in areas where undamaged shingles remained. We decline to apply <u>Erie</u> to these facts.

- 6 -

No. 83463-1-I/7

Godwin also cites the Seventh Circuit's decision in <u>Windridge Naperville Condominium Association v. Philadelphia Indemnity Insurance Company</u>, 932 F.3d 1035 (7th Cir. 2019), to support her policy interpretation. But that case is also distinguishable because the policy language at issue there differed in a material way. In that case, a hail storm damaged several of Windridge's condominium buildings. <u>Id.</u> at 1036. The hail damage was limited to the south and west walls of the buildings and the insurer indicated it would pay to replace the siding on only these walls. <u>Id.</u> at 1036. When Windridge learned the original siding was no longer available, it sued the insurer, arguing that it should pay to replace all of siding so that the walls matched. <u>Id.</u>

The Seventh Circuit agreed with Windridge. Windridge's insurance policy covered "[t]he cost to replace the lost or damaged property with other property . . . [o]f comparable material and quality." <u>Id.</u> at 1036-37. The court concluded that "the unit of covered property to consider under the policy (each panel of siding vs. each side vs. the buildings as a whole) is ambiguous as applied to [the facts]" and therefore favored the insured's interpretation that the covered property was the buildings as a whole. <u>Id.</u> at 1039-40. It held that

> while Philadelphia Indemnity's position that only the siding directly hit by the storm is covered is not indefensible and has some support in case law, the language of the policy is not so clear and in fact favors an interpretation that the unit of damaged property is the buildings as a whole—not solely each elevation or each panel of siding.

<u>Id.</u> at 1041.

Unlike the <u>Windridge</u> policy, Godwin's policy did not require State Farm to replace "lost or damaged property." It specifically required State Farm to replace

- 7 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83463-1-I/8

"the damaged <u>part</u> of the property." This additional language eliminates the ambiguity that existed in <u>Windridge</u>.

It is undisputed that the damage to Godwin's property was limited to missing shingles on the front slope and ridge of the roof. State Farm thus fulfilled its obligations under the policy by paying Godwin to replace those sections of the roof.

"Similar construction"

Godwin next argues that State Farm was obligated to pay to replace her entire roof based on the language requiring State Farm to "pay the cost to repair or replace with similar construction." She contends that because the new shingles did not visually match the existing old ones, the obligation to replace her roof "with similar construction" required the insurer to pay the cost of replacing undamaged shingles on the roof so that the shingles are uniform in appearance. We again disagree.

The parties first dispute the meaning of "similar construction." Godwin contends it means construction of "like kind and quality."[4] State Farm argues the phrase means "having characteristics in common." Although we are unconvinced that these two definitions are materially different in any meaningful way, Division Three of this court has considered the meaning of this same phrase in a State

---

[4] Godwin relies on the distinction between the coverage she selected in A1 that covers the cost of replacement with "similar construction," and A2, which covers only the cost of replacement with "common construction." Under Coverage A2, State Farm explicitly excludes coverage for "the cost to repair or replace obsolete, antique or custom construction with like kind and quality." Godwin argues that, because the less protective coverage option specifically disclaims the requirement that repairs be made with "like kind and quality," we should infer that A1 contains this requirement. But Godwin does not seek to recover the cost of replacing "obsolete, antique or custom construction." There is no evidence that an asphalt shingle roof falls into this category. Nevertheless, our conclusion remains the same whether the policy requires State Farm to cover the cost of making repairs of "like kind and quality" or "similar construction."

Farm homeowner policy and defined it as "having characteristics in common: very much alike" and "alike in substance and essentials." Poole v. State Farm Fire and Cas. Co., 6 Wn. App. 2d 860, 869-70, 431 P.3d 1084 (2018) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2120 (2002). In Allemand v. State Farm Ins. Co., the same court concluded that the phrase "similar construction" was unambiguous and meant "like or equivalent construction." 160 Wn. App. 365, 372, 248 P.3d 111 (2011) (holding that coverage A1 of State Farm policy did not include paying for required construction code upgrades). We see no reason to depart from these cases in defining the phrase "similar construction" in this case.

Under either party's definition, however, Godwin does not explain why the asphalt shingle repairs for which State Farm paid were not of similar construction to the asphalt shingles she had before the wind storm. It is undisputed that Delgado offered Godwin three options for replacement shingles and Godwin chose the CertainTeed Landmark shingles which, as Delgado testified, were "like for like" compared to her existing shingles. State Farm appears to have paid to repair or replace the damaged property, Godwin's roof shingles, with equivalent or substantially similar shingles.

Godwin contends that her new shingles, although comparable to the existing ones, have a different appearance than the existing, older shingles covering the rest of the roof. She argues that the only way State Farm could provide her with a roof of "similar construction" in this case is to replace all of the undamaged shingles with the new ones because her old shingles are no longer available.

- 9 -

We reject this argument for two reasons. First, the argument is inconsistent with other policy provisions. The policy explicitly excludes loss caused by "wear, tear, marring, scratching, [or] deterioration." It also draws a clear distinction between coverage to repair or replace "damaged" parts of the property and coverage to replace "undamaged portions of [a] damaged dwelling." Compare Coverage A1, and Option OL. The circumstances under which State Farm agreed to pay for losses to undamaged portions of a dwelling are limited to a specific situation: when the loss is caused by governmental enforcement of ordinances or laws. In Allemand, this court concluded that the phrase "similar construction" did not include an obligation to pay for required code upgrades and that the only provision of the State Farm policy to provide such coverage is the Option OL provision. 160 Wn. App. at 373.

If we adopted Godwin's interpretation of "similar construction," we would in effect nullify the limitations set out in Option OL of the policy and require State Farm to pay to replace an aged and deteriorated roof undamaged by a covered loss. We can easily harmonize all of these provisions of the policy by concluding that State Farm did not agree to replace undamaged, but deteriorated shingles, to ensure the policyholder's roof is uniform in appearance.

Second, the federal and out-of-state case law on which Godwin relies is unpersuasive. In National Presbyterian Church, Inc. v. GuideOne Mutual Insurance Company, 82 F. Supp.3d 55 (D.D.C. 2015), the federal district court for the District of Columbia addressed the question of whether a church insurance policy required the insurer to pay to replace all of the church's weathered exterior

- 10 -

limestone panels after an earthquake damaged some of them. The policy language at issue required the insurer to "[r]epair, rebuild or replace the property with other property of like kind and quality." Id. at 56-57 (emphasis added). But the policy also contained a loss payment provision that the court noted "could be read differently—perhaps more narrowly—referring only to 'lost or damaged property,' or to 'property' generically, without further description." Id. at 59.

The court explained that the loss payment provision "offers four different modes of coverage . . . two refer to 'lost or damaged property,' and two to 'property' alone." Id. "The provision certainly could be read either way, to repair a shingle or replace a roof—one of like kind and, therefore, matching." Id. Because the policy language was ambiguous, the court found in favor of the insured. Id. at 60.

But in this case, the policy language is not ambiguous. Unlike the loss payment provision in National Presbyterian, the loss payment provision of Godwin's policy clearly provided that the insurer would only pay the cost of repairing or replacing "the damaged part of the property." There is no ambiguity in this language, as existed in National Presbyterian.

Godwin also cites a federal court ruling in 160 Lee Street Condominium Homeowners' Association v. Mid-Century Insurance Company, No. C17-1170-MJP, 2018 WL 1994059 (W.D. Wash. 2018). In that case, the court considered a condominium association's insurance claim following a fire that damaged one of two condominium towers. The insurer paid to repair the damage to the tower but was unable to obtain siding that matched the existing undamaged tower. Id. at *3. The policy contained a provision giving the insurer the option to pay the value of

- 11 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the "lost or damaged property," or to "[r]epair, rebuild or <u>replace the property</u> with other property of like kind and quality." <u>Id.</u> at *2 (emphasis added). Citing <u>National Presbyterian Church</u>, the court held that the policy language requiring the insurer "to replace the property" with property of "like kind and quality" required the insurer to restore the entire building "to its condition before the fire—a condition in which there was no visual mismatch between the east and west towers." <u>Id.</u> at *4.

The policy language in <u>160 Lee Street</u> was the same as in <u>National Presbyterian</u> in that some provisions specifically referred to the insurer repairing the "damaged property" and other provisions referred to the insurer "replacing the property." <u>Id.</u> at *2. Unlike in <u>160 Lee Street</u>, State Farm agreed to repair or replace only "the damaged part of the property" with similar construction. We deem this language difference material here.

The remaining cases on which Godwin relies are equally unpersuasive. In <u>Alessi v. Mid-Century Insurance Company</u>, 464 S.W.3d 529 (Mo. Ct. App. 2015), the insurer's home, damaged by hail, was covered by a policy requiring the insurer to pay to replace "that part of the building damaged for equivalent construction and use." The court defined this language as meaning "equal in value" or "virtually identical." <u>Id.</u> at 532. Based on this definition, it concluded there were issues of fact as to whether the replacement siding the insurer was willing to pay for was "virtually identical" or if a house with mismatched siding was equal in value to a house with matching siding. <u>Id.</u> at 533. "[I]t is possible that there is siding on the market that is in fact 'nearly identical' to the existing siding on the other elevations of the property. Under this scenario, replacing the damaged siding on the northern

- 12 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

elevation with nearly identical siding is an equivalent replacement, meeting [the insurer's] contractual obligations." Id. at 532.

Here, Godwin presented no evidence that the shingles Delgado provided were not virtually identical to the ones she had on her roof. Delgado testified they were "like for like." Although Delgado stated that he could not match the shingles "for color or condition due to age and fading," the mismatch was not the result of a lack of virtually identical asphalt shingles, but was instead due to the age of the undamaged shingles. To the extent Alessi can be read as requiring an insurer to provide a new roof to achieve uniformity in appearance because the existing roofing material has faded and cannot be matched with new unfaded shingles of the same color, we decline to follow it.

Finally, Godwin refers us to Cedar Bluff Townhome Condominium Association v. American Family Mutual Insurance Company, 857 N.W.2d 290 (Minn. 2014), a case in which twenty condominium buildings sustained hail damage to some, but not all, of their siding panels. The homeowners' association argued that the insurance policy required the insurer to replace the siding on all of the buildings, including siding that was undamaged by hail, in order to provide a color match. Id. at 291.

As in National Presbyterian, the policy at issue gave the insurer the option to pay for the cost of repairing or replacing the damaged property or repairing, rebuilding or replacing "the property with other property of like kind and quality." Id. The insurer opted to pay the replacement cost of the damaged siding panels. The policy defined "replacement cost" as the cost to replace "lost or damaged

property with other property of comparable material and quality." Id. at 292. But because of the age of the panels, the color on the undamaged siding panels had faded and the association argued that the phrase "comparable material and quality" required a color match between the damaged and undamaged siding panels. Id. The court concluded that "on the spectrum of resemblance, 'comparable material and quality' requires something less than identical color match, but a reasonable color match nonetheless." Id. at 294.

The Cedar Bluff court further concluded that the insurance policy at issue specifically covered the replacement of undamaged property under the insurer's broad definition of "physical damage" as including "a distinct, demonstrable, and physical alteration." Id. at 295. "Because of the color mismatch resulting from the inability to replace the hail-damaged siding panels with siding of 'comparable material and quality,' the covered property—Cedar Bluff's 'buildings'—has sustained a "distinct, demonstrable, and physical alteration." Id.

Even if we concluded that Godwin's policy language is the same as in Cedar Bluff, which it is not, we have no evidence before us as to what color Godwin's roof shingles were before the wind storm and what colors of shingles were available to her after the wind storm. And even if replacement shingles of the same make and color were available, according to the materials Delgado provided from one manufacturer of asphalt shingles, "replacement shingles may not be an exact match. Even if the same color and style of shingle or accessory is available, the product may not appear to be an exact match to the existing shingles . . . due to normal weathering, aging, or other factors." Shingle manufacturers notify

- 14 -

No. 83463-1-I/15

customers that if they provide replacement shingles in the future, the shingles a homeowner receives may "vary in color either because of normal weathering or changes in our shingle or [p]roduct line." It appears even shingle manufacturers are unwilling to warrant their ability to provide an "identical" color match.

Godwin's policy language is more comparable to that at issue in <u>Eledge v. Farmers Mutual Home Insurance Company of Hooper, Nebraska</u>, 571 N.W.2d 105 (Neb. App. 1997). The policy in that case covered "the replacement cost of that part of the building damaged for like construction and use," but did not cover damage for "depreciation." <u>Id.</u> at 111-12. Like Godwin, Eledge argued that their insurance policy entitled them to the reasonable cost to replace the entire roof after hail damaged only one slope of their roof, which was "at the end of its useful life." <u>Id.</u> at 110-11. The court disagreed and found the policy language to be unambiguous: "A plain reading of the provision does not require the replacement of the whole when it is factually shown that the whole can be satisfactorily repaired by replacement of a 'part,' so long as the building is returned to 'like construction and use' as a result." <u>Id.</u> at 112. As in <u>Eledge</u>, Godwin's policy merely requires State Farm to pay the cost to repair or replace "the damaged part of the property," using materials comparable to the damaged property. The record establishes that State Farm did so here.

We conclude that the policy did not require State Farm to pay for repairs to undamaged parts of the roof in order to achieve aesthetic uniformity and the trial court did not err in granting summary judgment on this basis.

- 15 -

<u>Building Ordinance or Law</u>

Finally, Godwin argues that, even if she is not entitled to replace the entire roof under Coverage A1, the policy requires State Farm to pay to replace the entire roof under Option OL, the provision dealing with losses caused by the enforcement of building codes.  We disagree.

Option OL provided:

**Option OL—Building Ordinance or Law.**
. . .
**3. Undamaged Portions of Damaged Dwelling.**
When the dwelling covered under **COVERAGE A— DWELLING** is damaged by a Loss Insured we will also pay for:
. . .

> b. loss to the undamaged portion of the dwelling caused by enforcement of any ordinance or law if:
>
>> (1) the enforcement is directly caused by the same Loss Insured;
>> (2) the enforcement requires the demolition of portions of the same dwelling not damaged by the same Loss Insured;
>> (3) the ordinance or law regulates the construction or repair of the dwelling, or establishes zoning or land use requirements at the described premises; and
>> (4) the ordinance or law is in force at the time of the occurrence of the same Loss Insured; or
>
> c. legally required changes to the undamaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law, if:
>
>> (1) the enforcement is directly caused by the same Loss Insured;
>> (2) the requirement is in effect at the time the Loss Insured occurs; and
>> (3) the legally required changes are made to the undamaged portions of specific dwelling features, systems or components that have been physically damaged by the Loss Insured.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83463-1-I/17

> We will not pay for legally required changes to specific dwelling features, systems or components that have not been physically damaged by the Loss Insured.

In Commonwealth Ins. Co. of America v. Grays Harbor County, 120 Wn. App. 232, 242, 84 P.3d 304 (2004), Division Two of this court held that the phrase "enforcement of any law" in an insurance policy does not mean "what the code might legally require but . . . what the building official requires (enforces)."

Godwin presented no evidence that any building official required her to replace her entire roof. It is undisputed that the repairs on Godwin's roof did not require a permit or inspection. While Delgado testified that he believed the International Residential Code required him to increase the ventilation in Godwin's attic and to achieve the necessary ventilation he had to install edge vents on both slopes of the roof to balance the ventilation, his opinion is immaterial under the language of Option OL. What matters is whether a building official enforced a particular code provision and whether that act of enforcement required Godwin to replace her entire roof.[5] Godwin presented no evidence that any building official enforced any provision of a building code and that this enforcement action caused her to sustain a loss to the undamaged portion of her roof. Because there was no enforcement of a law or ordinance causing Godwin to lose the undamaged portion

---

[5] Other courts have also construed this or similar contract language as requiring an affirmative action of a governmental regulatory body. See Mason v. Shelter Mutual Ins. Co., 209 So. 3d 860, 871 (La. Ct. App. 2016) (losses due to compliance with applicable law do not result from the "enforcement of any ordinance or law" unless there is an attempt by a governing body to enforce that law); Ira Stier, D.D.S., P.C. v. Merchants Ins. Group, 7 N.Y.S. 3d 365, 366-67 (N.Y. App. Div. 2015) (town building inspector order requiring closure of business until certificate of occupancy was obtained was a "loss caused by the enforcement of any ordinance or law"); JAW The Pointe, L.L.C. v. Lexington Ins. Co., 460 S.W.3d 597, 600-01 (Tex. 2015) (losses caused by city's enforcement of ordinances requiring demolition of apartment building); City of Elmira v. Selective Ins. Co. of N.Y., 921 N.Y.S. 2d 662, 664 (N.Y. App. Div. 2011) (losses caused by fire marshal's finding that building was in violation of building code).

- 17 -

No. 83463-1-I/18

of her roof, State Farm was not required to cover repairs to the undamaged portions of the roof under Option OL of the policy.[6]  We therefore affirm the trial court on the basis that the requirements of Option OL have not been met.

Because we affirm dismissal on summary judgment, we deny Godwin's request for an award of attorney fees on appeal under RAP 18.1.

Affirmed.

_Andrus, C.J._

WE CONCUR:

_Mann, J._          _Dwyer, J._

---

[6] Godwin also assigns error to the trial court's denial of her motion for reconsideration of the order granting summary judgment for State Farm.  We review a trial court's denial of a motion for reconsideration for abuse of discretion.  Rivers v. Wash. State Conf. of Mason Contractors, 145 Wn.2d 674, 685, 41 P.3d 1175 (2002).  Because the trial court did not err in granting summary judgment to State Farm, it did not abuse its discretion in denying her motion for reconsideration.